RECORD NO. 17-1248

In The

# United States Court of Appeals
### For The Fourth Circuit

## RONALD G. ULLRICH,

*Plaintiff – Appellant,*

**v.**

## CEXEC, INC.,

*Defendant – Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

—————————

**BRIEF OF APPELLANT**

—————————

**R. Scott Oswald**
**Nicholas Woodfield**
**EMPLOYMENT LAW GROUP, PC**
**888 17th Street, NW, Suite 900**
**Washington, DC  20006**
**(202) 261-2812**

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1248__          Caption: __Ronald G. Ullrich v. CEXEC, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ronald G. Ullrich__
(name of party/amicus)



who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                       ☐ YES ☑ NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                           ☐ YES ☑ NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☐ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: 03/08/2017

Counsel for: Appellant Ronald G. Ullrich

## CERTIFICATE OF SERVICE
****************************

I certify that on 03/08/2017 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven W. Ray, Esq.                    Amanda DiSanto, Esq.
IslerDare, PC                          IslerDare, PC
1945 Old Gallows Road                  1945 Old Gallows Road
Suite 650                              Suite 650
Vienna, Virginia 22182                 Vienna, Virginia, 22182

_____              03/08/2017
(signature)                            (date)

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF JURISDICTION ....................................................1

STATEMENT OF THE ISSUES .........................................................2

STATEMENT OF THE CASE ...........................................................3

SUMMARY OF ARGUMENT .........................................................10

ARGUMENT ...................................................................................11

     I.     Standard of Review .........................................................11

     II.    The district court erred by holding that a six month gap between the filing of an EEO charge and a termination was inadequate temporal proximity despite Rhodes' announcing 4-5 times in the interim that he wanted to terminate Ullrich and that his EEO charge required a great deal of time and money and that it was a "distraction" for CEXEC ...................................................11

     III.   The district court erred when it held that Ullrich could not demonstrate that CEXEC's proffered reasons for terminating him were pretextual despite Rhodes's many declarations of his intent to terminate Ullrich and that Ullrich's EEO charge required a great deal of time and money and that it was a "distraction" for CEXEC ...................................................16

CONCLUSION .................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986)..................................................................................11, 18

*Clark Cnty. Sch. Dist. V. Breeden*,
532 U.S. 268 (2001)..........................................................................................14

*Coursey v. Univ. of Md. E. Shore*,
577 Fed. App'x 167 (4th Cir. 2014) ................................................................14

*Foster v. Univ. of Md. E. Shore*,
787 F.3d 243 (4th Cir. 2015) ....................................................13, 14, 15, 17

*Grayson O Company v. Agadir International LLC*,
__ F.3d __, 2017 WL 1754887 (4th Cir. May 5, 2017) ................................11

*Haulbrook v. Michelin N. Am*,
252 F.3d 696 (4th Cir. 2001) ........................................................................13

*Jaudon v. Elder Health, Inc.*,
125 F. Supp. 2d 153 (D. Md. 2000)................................................................14

*Lorenz v. Fed. Exp. Corp.*,
No. 7:10-cv-00487, 2012 WL 4459570 (W.D. Va. Aug. 17, 2012) ............14

*Poindexter v. Mercedes-Benz Credit Corp.*,
792 F.3d 406 (4th Cir. 2015) ........................................................................11

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)....................................................................12, 13, 16, 17

*Tex. Dep't of Comm. Affairs v. Burdine*,
450 U.S. 248 (1981)........................................................................................17

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014)..................................................................................18

*Warch v. Ohio Cas. Ins. Co.*,
  435 F.3d 510 (4th Cir. 2006) ..............................................................13, 17

## **STATUTES**

28 U.S.C. § 1291.............................................................................................1

28 U.S.C. § 1331.............................................................................................1

29 U.S.C. § 621, *et seq*...................................................................................1

42 U.S.C. § 12101, *et seq*...............................................................................1

## **RULE**

Fed. R. Civ. P. 56(a)....................................................................................11

## **STATEMENT OF JURISDICTION**

The United States District Court for the Eastern District of  Virginia had subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  The claims arose under the laws of the United States, specifically the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq*., and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the district court's grant of Appellee's motion for summary judgment on February 9, 2017 and the Court's entry of judgment in Appellee's favor on February 14, 2017.  On February 23, 2017, Appellant Ronald G. Ullrich timely filed a notice of appeal with the district court.

## **STATEMENT OF THE ISSUES**

I.  Whether the district court erred by granting summary judgment on claims of ADEA and the ADA retaliation when it held that a five and a half month gap between the filing of an EEO charge and a termination was inadequate temporal proximity, despite the decision maker's announcing 4-5 times that he wanted to terminate the employee, that the legal defense to the EEO charge required a great deal of time and money, and that it was a "distraction" for the business while being cautioned several times by HR in response to be careful about terminating the employee because it would look like retaliation.

II. Whether the district court erred by granting summary judgment on claims of ADEA and the ADA retaliation when it held that an employee could not demonstrate that his employer's proffered legitimate, nondiscriminatory reasons for terminating him were pretextual, despite the decision maker's announcing 4-5 times that he wanted to terminate the employee, that the legal defense to the EEO charge required a great deal of time and money, and that it was a "distraction" for the business while being cautioned several times by HR in response to be careful about terminating the employee because it would look like retaliation.

## STATEMENT OF THE CASE

Ullrich began his career at CEXEC in 1984. J.A. at 56. CEXEC employed about 80 people at all times relevant to this action, and Ullrich rose within the ranks of CEXEC, becoming a Vice President in 2003 and taking on the duties typically associated with a Chief Operations Officer in 2008. *Id*. at 376-79. Ullrich had the authority as CEXEC's COO and Senior Vice President to hire and terminate employees, to determine which contracts CEXEC would pursue, and to perform project management review. *Id*. In 2011 CEXEC's President and CEO Douglas Rhodes relinquished his duties to his son, Weston Rhodes (hereinafter "Rhodes"). *Id*. at 56. Weston Rhodes remains president and CEO of CEXEC. *Id*. at 56-57.

In early March 2014, Carolyn Cahoon, CEXEC's director of human resources, and Rhodes accused Ullrich of "being spacey" at work. J.A. at 392-93. Rhodes and Cahoon also asked Ullrich questions to the effect of "[w]hat's going on with you?" and said that Ullrich "didn't seem to be himself." *Id*. Ullrich was unaware of any changes in his behavior, but he informed Rhodes and Cahoon that he had begun taking new medications. *Id*. at 393.

Rhodes visited Ullrich's office shortly after the March 2014 meeting and told Ullrich that he would be required to produce a medical note from his physician. J.A. at 394. As requested Ullrich's physician's office sent a letter to

CEXEC on March 14, 2014. *Id*. at 561. The letter declared, in relevant part, that Ullrich had been medically cleared to work and that his medications would not affect his "performance at work in his timeliness, responsiveness, and attention to detail." *Id*.

However, Rhodes claimed that Ullrich's physician's note was insufficient and that it should have been sent to CEXEC earlier. J.A. at 468-69. Cahoon claimed she thought the wording of the letter was "awkward," but she also understood that the situation might require CEXEC to provide Ullrich with a medical accommodation. *Id*. at 441-43. Accordingly, on March 14, 2014, Cahoon sent a follow-up letter to Ullrich's physician's office. *Id*. at 443-44. In her letter Cahoon requested that Ullrich's physician provide an explanation how the physician concluded that Ullrich's performance would not be affected. *Id*. at 563. Cahoon also sought verification that Ullrich would experience no further effects. *Id*. Cahoon subsequently sent another follow-up letter to the physician's office on March 17, 2014. *Id*. at 442.

On May 8, 2014, CEXEC received notice from a customer, the Federal Aviation Administration, that one of CEXEC's employees had been implicated in a harassment complaint. J.A. at 501-06. The next day Rhodes instructed Ullrich to "[f]ind out. Conduct our own investigation get HR involved and let me know today the preliminary findings. May need to get legal involved to either protect our

employee or CEXEC." *Id*. at 502. Ullrich immediately contacted Rob O'Neill, CEXEC's on-site manager at the FAA and asked him to speak to the employee in question. *Id*. at 401. Ullrich took this course of action because O'Neill was immediately on site and was able to interview the employee. *Id*. at 401. Moreover, Ullrich consulted with Cahoon, CEXEC's HR Director, concerning the best course of action for CEXEC to handle the situation. *Id*. at 447-48. Ullrich also sought Cahoon's help in contacting CEXEC's lawyers. *Id*. at 404-05. Ullrich then updated Rhodes later that day on the situation. *Id*. at 503.

Thereafter Rhodes later sent an email to Ullrich declaring that "[y]our abdication of responsibility is something that we will discuss when I get back on Monday, please be available." J.A. at 504. On May 12, 2014, Rhodes met with Ullrich, Cahoon and another manager, Gail Parmentier, CEXEC's chief financial officer, to a meeting in which Rhodes discussed a "lack of leadership." *Id*. at 571. Rhodes then dismissed Parmentier and Cahoon and directed Ullrich stay behind. *Id*. Rhodes then told Ullrich he did not possess appropriate "leadership instinct." *Id*.

Following the meeting Ullrich met with Cahoon May 12, 2014, and filed a formal complaint of harassment against Rhodes. J.A. at 449-51, 569. Cahoon testified that she understood Ullrich's complaint to include an allegation of age discrimination and investigated the possibility of such discrimination. *Id*. at 449-

5

51, 508-12, 514-18. On May 22, 2014, Cahoon provided Rhodes with a memorandum regarding her internal harassment complaint, including what she investigated and the results. *Id.* at 508-12. The next day Cahoon sent Ullrich a description of his new position. J.A. at 520.

Ullrich's new position was effectively an out-of-cycle demotion, and it reduced Ullrich's salary by about $50,000 per year. *Id.* at 575. Ullrich's new job required him to submit "10 different proposals for qualified new business opportunities with the NRC, or other new customers, within the next 12 months and every 12 months period thereafter," and it prescribed a revenue goal of four million dollars within the next 12 months. J.A. at 575.

In addition to changing Ullrich's duties and tasking him with business development duties, Rhodes commenced excluding Ullrich from attending weekly business development meetings, meetings that Ullrich had previously conducted weekly. J.A. at 419. In response to this treatment by CEXEC, Ullrich filed on March 24, 2015, a charge of discrimination against CEXEC with the Equal Employment Opportunity Commission. J.A. at 579. Ullrich's charge alleged discrimination on the basis of age and perceived disability that had been ongoing since at least January 2014. J.A. at 579.

Thereafter, Rhodes had at least four or five conversations with Cahoon in which Rhodes told Cahoon that he wanted to terminate Ullrich's employment. J.A.

at 456-57. According to Cahoon, Rhodes had conversations with her to the effect that he understood that CEXEC would be required to spend a great deal of money and time on the legal defense of Ullrich's EEOC charge and that he considered it a "distraction" to CEXEC's business. *Id*. at 459-60.  Rhodes made these comments in the context of an acknowledged financial downturn for CEXEC, which was the very rationale that it offered for having to terminate Ullrich's employment. J.A. at 543-44. Cahoon resigned her employment with CEXEC in May of 2015, but before she left Cahoon cautioned Rhodes on several occasions in response to the forgoing comments about Ullrich that Rhodes needed to be careful about terminating Mr. Ullrich because it would look like retaliation for Ullrich's having made a complaint of discrimination or retaliation. J.A. at 457-59.

After Cahoon resigned Rhodes made the unilateral decision on September 9, 2015, to terminate Ullrich's employment, effective September 21, 2015. J.A. at 556. On September 8, 2015, Devon Musselman sent Ullrich an email in which he instructed Ullrich to "either find direct coverage for yourself immediately, or […] immediately identify a viable business opportunity for you to actively pursue that we think has a probability of win for CEXEC." J.A. at 581. Rhodes sent an email on September 9, 2015, to members of CEXEC's management team in which he ordered the team to begin taking the necessary steps to effectuate the terminations of Ullrich and another employee, Richard Marks. *Id*. Around the same time,

CEXEC also instructed two other similarly situated individuals, Larry Hottot and Woody Long, that they too would be required to find directly billable work. *Id*. at 545.

On September 16, 2015, CEXEC prepared Ullrich's termination paperwork. *Id*. at 558-59. Thereafter, Ullrich submitted the requested plan on September 20, 2015, the date on which it was due. *Id*. at 583-94. Ullrich's plan included an opportunity for his becoming directly billable. *Id*. at 592. Nevertheless on September 21, 2015, CEXEC terminated Ullrich's employment. J.A. at 543-44. CEXEC claimed it terminated Ullrich as the result of a revenue shortfall and Ullrich's not identifying directly billable work that he could pursue immediately. *Id*. Unlike Ullrich, however, CEXEC did not require Hottot to present a direct work plan. *Id*. Moreover, neither Hottot nor Long became directly billable until at least November 2015, and yet they were not terminated. *Id*. at 546-57.

After Ullrich's termination, but while his EEO charge was still pending, Rhodes contemplated in October 2015 the possibility of criminally prosecuting Ullrich for alleged misuse of his CEXEC-issued computer and hard drive. J.A. at 494-96. Rhodes claimed that there was evidence that Ullrich "destroyed evidence" and retained CEXEC documents that he should not have possessed after his termination. J.A. at 494-96. When questioned, however, Rhodes admitted that he had no evidence that Ullrich had ever used any CEXEC documents after his

termination. *Id*. at 497. On October 28, 2015, Rhodes wrote an email and distributed it to Lana Zarger, Chris Cheung, and Devon Musselman. *Id*. at 602. In his email Rhodes instructed these individuals to consider the issues surrounding Ullrich's laptop as "what may be a criminal investigation." *Id*.

      Ullrich filed a lawsuit in the United States District Court for the Eastern District of Virginia on May 25, 2016. J.A at 2. Ullrich later filed an Amended Complaint on September 16, 2016. *Id*. at 7-36. Defendant filed a Motion for Summary Judgment on January 6, 2017. *Id*. at 60-103. Ullrich filed an Opposition on January 19, 2017. *Id*. at 338-72. CEXEC filed a Reply on January 25, 2017. *Id*. at 603-26. The district court held an oral argument on CEXEC's motion on February 3, 2017. *Id*. at 652-68. The district court then granted CEXEC's motion on February 9, 2017. *Id*. at 670-94. Ullrich timely filed a Notice of Appeal on February 23, 2017. *Id*. at 696-97.

# SUMMARY OF ARGUMENT

The trial court erred when it held that Ullrich did not demonstrate a causal relationship based on temporal proximity and other evidence in light of the five and a half month delay between Ullrich's March 24, 2015 EEO charge of discrimination against CEXEC and its decision on September 9, 2015, to terminate Ullrich's employment, effective September 21, 2015, as it failed to view the evidence of temporal proximity in combination with CEXEC's CEO's multiple statements of intent to retaliate against Ullrich because he made them 3-5 months before he made the decision to terminated Ullrich's employment with CEXEC.

The district court also erred when it held that "even if plaintiff could establish a prima facie case, his ADEA and ADA retaliation claims would nevertheless fail because defendant had legitimate, nondiscriminatory reasons for demoting and terminating plaintiff and he cannot establish that those reasons were pretextual," because it selectively considered Ullrich's proffered evidence of pretext, weighed the evidence in favor of CEXEC, and made determinations as to the truth of the matters in question.

# ARGUMENT

## I.    Standard of Review.

The Court reviews *de novo* a district court's grant of summary judgment. *Grayson O Company v. Agadir International LLC*, __ F.3d __, 2017 WL 1754887, at *2 (4th Cir. May 5, 2017). This Court applies the same standard as the district court, and it must construe all evidence in the light most favorable to Ullrich and draw all justifiable inferences in Ullrich's favor. *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 409 (4th Cir. 2015). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).

## II.    The district court erred by holding that a six month gap between the filing of an EEO charge and a termination was inadequate temporal proximity despite Rhodes' announcing 4-5 times in the interim that he wanted to terminate Ullrich and that his EEO charge required a great deal of time and money and that it was a "distraction" for CEXEC.

The trial court erred when it held that Ullrich did not demonstrate a causal relationship based on temporal proximity and other evidence in light of the five and a half month delay between Ullrich's March 24, 2015 EEO charge of discrimination against Rhodes and CEXEC and Rhodes' unilateral decision on September 9, 2015, to terminate Ullrich's employment, effective September 21,

2015.  The district court's rationale for rejecting Ullrich's proffered evidence of a

causal link, was that

> The record does not disclose when Rhodes made that comment to Cahoon,
> but it could not have been after May 2015, as Cahoon had left the company
> by then, and this was four months before plaintiff's termination. Moreover,
> Rhodes said nothing about plaintiff's EEOC complaint in his September 9,
> 2015 email informing several managers that plaintiff and another employee
> would be laid off due to revenue shortfalls.

J.A. at 693-94.  However, this holding is contrary to the Supreme Court's holding

in *Reeves v. Sanderson Plumbing Products, Inc.*, wherein it noted that:

> In holding that the record contained insufficient evidence to sustain the
> jury's verdict, the Court of Appeals misapplied the standard of review
> dictated by Rule 50. Again, the court disregarded critical evidence favorable
> to petitioner—namely, the evidence supporting petitioner's prima facie case
> and undermining respondent's nondiscriminatory explanation. See 197 F.3d,
> at 693–694. The court also failed to draw all reasonable inferences in favor
> of petitioner. For instance, while acknowledging "the potentially damning
> nature" of Chesnut's age-related comments, <u>the court discounted them on
> the ground that they "were not made in the direct context of Reeves's
> termination."</u> *Id.,* at 693.

*Reeves,* 530 U.S. 133, 152 (2000) (emphasis added).  In so holding, the district

court effectively held that Rhodes multiple statements of intent to retaliate against

Ullrich were inadequate evidence as a matter of law to prove causation because he

made them 3-5 months before he terminated Ullrich's employment even though the

comments in *Reeves* were deemed relevant evidence for the jury to consider.[1]

     Under both the ADEA and ADA, to make out a prima facie case of

retaliation, a plaintiff must show that: 1) he engaged in protected activity; 2) his

employer took an adverse action against him, and 3) that there is a causal link

between the protected activity and the protected activity and the adverse action.

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001). Like

discrimination cases, retaliation cases utilize the *McDonnell Douglas* burden

shifting framework. *Foster v. univ. of Md. E. Shore*, 787 F.3d 243, 253-54 (4th Cir.

2015). If the plaintiff puts forth that *prima facie* case, the employer then bears the

burden of showing that it took the action it did based on legitimate, non-

discriminatory business reasons. *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 513-

---

[1] The *Reeves* court noted that:

> Moreover, the other evidence on which the court relied—that Caldwell and
> Oswalt were also cited for poor recordkeeping, and that respondent
> employed many managers over age 50—although relevant, is certainly not
> dispositive. *See Furnco,* 438 U.S., at 580, 98 S.Ct. 2943 (evidence that
> employer's work force was racially balanced, while "not wholly irrelevant,"
> was not "sufficient to *conclusively* demonstrate that [the employer's] actions
> were not discriminatorily motivated"). In concluding that these
> circumstances so overwhelmed the evidence favoring petitioner that no
> rational trier of fact could have found that petitioner was fired because of his
> age, the Court of Appeals impermissibly substituted its judgment concerning
> the weight of the evidence for the jury's.

*Reeves*, 530 U.S. at 152–53.

14 (4th Cir. 2006). A plaintiff can demonstrate that the employer's rationale is pretextual by showing that discriminatory or retaliatory animus, not the purported legitimate business reason, is the real reason for the adverse action. *Foster*, 787 F.3d at 253-54.

Temporal proximity between protected activity and an adverse employment action is strong evidence of causation. *Coursey v. Univ. of Md. E. Shore*, 577 Fed. App'x 167, 175 (4th Cir. 2014). There exists "no precise formula as to when an employer's actions will trigger application of [the temporal proximity] inference." *Id*. Temporal proximity need be very close only *in cases in which it is the only evidence of causation*. *Clark Cnty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001). However, causation may also be shown when there is "'an intervening pattern of retaliatory conduct, inconsistent reasons by the employer for the adverse action taken, and differential treatment of other employees.'" *Lorenz v. Fed. Exp. Corp*., No. 7:10-cv-00487, 2012 WL 4459570, at * 10 (W.D. Va. Aug. 17, 2012) (quoting *Jaudon v. Elder Health, Inc*., 125 F. Supp. 2d 153, 165 (D. Md. 2000)).

The Fourth Circuit examined a very similar situation in *Foster v. University of Maryland-Eastern Shore*, in which it noted that:

> Foster argues that she can show causation by means of (i) Billie's statement of retaliatory animus; (ii) the temporal proximity between Foster's final complaint of retaliation and her termination; and (iii) the additional retaliatory acts that preceded her firing. Billie's statement that Foster was fired because "everything that ever happened she [Foster] attributed to the sexual harassment complaint," J.A. 323,

14

*suggests* that Billie and Holden fired Foster because she complained about retaliation.

Foster's evidence of temporal proximity also *tends to show causation:* according to her uncontradicted testimony, she complained to Billie about perceived retaliation on September 21, 2007, and again on September 28, 2007, just a month before she was terminated.[16] *See King v. Rumsfeld,* 328 F.3d 145, 151 & n. 5 (4th Cir.2003) (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity). Taken together, this evidence is sufficient to create a jury question regarding the causation prong of the prima facie case.

*Foster*, 787 F.3d at 253.

In the district court below the first two prongs were undisputed. J.A. at 691. However, the district court below construed the evidence of causation in a light most favorable to CEXEC, as the evidence equally suggests that Rhodes was only free to act on his declared intent to retaliate against Ullrich after Cahoon was no longer cautioning him not to retaliate.  Moreover, the evidence is uncontradicted that in the roughly sixty days between when Ullrich filed his EEO charge and Cahoon resigned, Rhodes told Cahoon 4-5 that he wanted to terminate Ullrich's employment and that CEXEC had to spend a great deal of money and time in an economically challenged period for CEXEC on the legal defense of Ullrich's EEOC charge and that he considered it a "distraction" to CEXEC's business.

Finally, the district court's rationale declared that it rejected Ullrich's evidence of causation because "[m]oreover, Rhodes said nothing about plaintiff's

EEOC complaint in his September 9, 2015 email informing several managers that plaintiff and another employee would be laid off due to revenue shortfalls." J.A. at 694. However, this holding is contrary to the Supreme Court's holding in *Reeves*, wherein it noted that:

> The court also failed to draw all reasonable inferences in favor of petitioner. For instance, while acknowledging "the potentially damning nature" of Chesnut's age-related comments, the court discounted them on the ground that they "were not made in the direct context of Reeves's termination." *Id.,* at 693.

*Reeves,* 530 U.S. at 152 (emphasis added). In light of the forgoing it is evident the district court committed legal error when it rejected as sufficient for summary judgment purposes Ullrich's evidence of a causal link.

**III.    The district court erred when it held that Ullrich could not demonstrate that CEXEC's proffered reasons for terminating him were pretextual despite Rhodes's many declarations of his intent to terminate Ullrich and that Ullrich's EEO charge required a great deal of time and money and that it was a "distraction" for CEXEC.**

The district court erred when it held that "even if plaintiff could establish a prima facie case, his ADEA and ADA retaliation claims would nevertheless fail because defendant had legitimate, nondiscriminatory reasons for demoting and terminating plaintiff and he cannot establish that those reasons were pretextual," *See supra* Part II.A., J.A. at 694, because it selectively considered Ullrich's proffered evidence of pretext and weighed the evidence and determined the truth of the matter.

Under the *McDonnell Douglas* burden shifting framework, if the employer makes its required showing, then the burden shifts back to the plaintiff to show that the purported non-discriminatory reason is pretext. *Warch,* 435 F.3d at 514. A plaintiff can demonstrate that the employer's rationale is pretextual by showing that discriminatory or retaliatory animus, not the purported legitimate business reason, is the real reason for the adverse action. *Foster*, 787 F.3d at 253-54. A plaintiff can meet this burden "'by showing that the defendant's proffered explanation is unworthy of credence.'" *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

At Part II.A., the district court noted that:

> Defendant's proffered reason for terminating plaintiff is that the company was facing a revenue shortfall, which prompted Rhodes to mark plaintiff and one other overhead employee for layoffs unless they could secure direct billable work or identify a viable contract opportunity that defendant could immediately pursue. After plaintiff failed to secure direct billable work or identify an immediate contract opportunity, he was laid off.

J.A. 685.  The district court then rejected and disregarded the bulk of Ullrich's pretextual evidence and instead construed the evidence in a light most favorable to CEXEC:

> Plaintiff argues that there is a genuine issue of material fact as to whether his work plan was insufficient because he identified a potential contract opportunity that could have become directly billable in a short amount of time. Plaintiff acknowledges, however, that the RFP for the contract had not even been released when he submitted his work plan, which not only meant that defendant could not

17

immediately bid on the contract, but also prevented defendant from assessing whether the contract was truly viable. Clearly, Rhodes did not consider the work plan sufficient, and it is the employer's perspective that matters when assessing whether a proffered reason for termination is pretextual. *See DeJarnette v. Corning, Inc.,* 133 F.3d 293,299 (4th Cir. 1998) ("[W]e have repeatedly explained that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal quotation marks and brackets omitted). Plaintiff's argument that two other employees, Larry Hottot and Woody Long, were not terminated even though they also needed to become directly billable is belied by the fact that they had already secured direct billable work when plaintiff was terminated. Furthermore, defendant clearly did not favor younger workers by retaining Hottot and Long, who are 61 and 62, whereas plaintiff is *55*.

J.A. 685-86.

However, the Supreme Court has held that a court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). This holding is an application of the general rule that at the summary judgment stage "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249).

In the matter below, the facts reveal that Rhodes wanted, in reality, to terminate Ullrich for filing an EEO charge that was costing CEXEC money in an economically challenging environment. Ullrich filed his EEOC charge of discrimination against Rhodes and CEXEC on March 24, 2015, and thereafter Rhodes had at least four or five conversations with Cahoon in which Rhodes told

18

Cahoon that he wanted to terminate Ullrich's employment. J.A. at 456-57. Cahoon testified that Rhodes had conversations with her to the effect that he understood that CEXEC would be required to spend a great deal of money and time on the legal defense of Ullrich's EEOC charge and that he considered it a "distraction" to CEXEC's business. *Id*. at 459-60. Rhodes made these comments in the context of an acknowledged financial downturn for CEXEC, which was the very rationale that it offered for having to terminate Ullrich's employment. J.A. at 543-44. Cahoon resigned her employment with CEXEC in May of 2015, but before she left Cahoon cautioned Rhodes on several occasions in response to the forgoing comments about Ullrich that Rhodes needed to be careful about terminating Mr. Ullrich because it would look like retaliation for Ullrich's having made a complaint of discrimination or retaliation. J.A. at 457-59. After Cahoon resigned Rhodes made the unilateral decision on September 9, 2015, to terminate Ullrich's employment, effective September 21, 2015, J.A. at 556, well before any "Get Direct Plan" was due for submission.

Moreover, Ullrich proffered evidence that the direct work plan he submitted to Devon Musselman met CEXEC's requirement – that Ullrich find direct coverage or identify a plan which CEXEC had a viable opportunity to obtain. J.A. at 347, 357-58, 364, 581. Ullrich included such a plan within his direct work plan. *Id*. at 347, 364. CEXEC also instructed two other individuals, Larry Hottot and

19

Woody Long to find direct work, similarly to Ullrich. J.A. at 545. However, CEXEC did not require Hottot to present a direct work plan at all. *Id*. And neither Hottot nor Long became directly billable until at least November 2015. *Id*. at 546-57. However, those individuals remained employed, despite Ullrich's having been terminated for purportedly not identifying a job on which he could become directly billable before September 21, 2015.

Additionally, there is evidence in the record below that Weston Rhodes actually made the decision to terminate Ullrich on September 9, 2015, before Ullrich had the chance to submit a work plan. J.A. at 556. In fact, on that date, Rhodes ordered other members of the CEXEC team to begin taking the necessary steps to effectuate the terminations of Ullrich and another employee, Richard Marks. *Id*. The record below also shows that CEXEC prepared the paperwork necessary to carry out Ullrich's termination on September 16, 2015. *Id*. at 558-59. Thus, Ullrich presented evidence from which a jury could reasonably conclude that CEXEC's purported rationale for Ullrich's termination is false or unworthy of credence.

## CONCLUSION

The district court committed legal error by failing to properly credit the evidence put forward by Ullrich, the non-moving party in the summary judgment motion below. As a result of this legal error, the district court erred by failing to properly credit his evidentiary proffer in support of his retaliation claims in violation of the ADEA and ADA.

For these reasons, this Court should reverse the district court's grant of summary judgment in favor of CEXEC on Ullrich's ADEA and ADA retaliation claims and remand to the district court for a trial by jury.

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, NW, 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com

*Counsel for the Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*4,730*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>May 26, 2017</u>                    <u>/s/ Nicholas Woodfield</u>
                                                                    *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 26th day of May 2017, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amanda S. DiSanto
Steven W. Ray
ISLER DARE, PC
1945 Gallows Road, Suite 650
Vienna, Virginia  22182
(703) 663-1317

*Counsel for Appellee*

I further certify that on this 26th day of May 2017, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Nicholas Woodfield
*Counsel for Appellant*