RECORD NO. 17-1248

In The
# United States Court of Appeals
### For The Fourth Circuit

## RONALD G. ULLRICH,

*Plaintiff – Appellant*,

v.

## CEXEC, INC.,

*Defendant – Appellee*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

### REPLY BRIEF OF APPELLANT

**R. Scott Oswald**
**Nicholas Woodfield**
**EMPLOYMENT LAW GROUP, PC**
**888 17th Street, NW, Suite 900**
**Washington, DC  20006**
**(202) 261-2812**

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

    I.     It is unclear why CEXEC argues that Ullrich waived issues he did not brief, as such issues are not the before this Court for consideration. ........................................................................................1

    II.    Ullrich accurately set forth evidence of Rhodes's animus....................1

    III.   Ullrich establishes a prima facie case of retaliation.............................7

    IV.   CEXEC's asserted legitimate business reason is pretext. .....................8

CONCLUSION........................................................................................................11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Clark Cty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001)......................................................................................8

*Foster v. Univ. of Md. E. Shore*,
    787 F.3d 243 (4th Cir. 2015) .......................................................................7

*Haulbrook v. Michelin N. Am.*,
    252 F.3d 696 (4th Cir. 2001) .......................................................................7

*Haywood v. Locke*,
    387 F. App'x 355 (4th Cir. 2010)...............................................................10

*Humphries v. CBOCS West, Inc.*,
    474 F.3d 387 (7th Cir. 2007) .....................................................................10

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)..................................................................................6, 8

*St. Mary's Honor Center v. Hicks*,
    509 U.S. 502 (1993)......................................................................................9

*Wahi v. Charleston Area Med. Ctr., Inc.*,
    562 F.3d 599 (4th Cir. 2009) .......................................................................1

I. **It is unclear why CEXEC argues that Ullrich waived issues he did not brief, as such issues are not the before this Court for consideration.**

Ullrich did not argue on appeal the district court's grant of summary judgment on his ADEA or ADA discrimination claims. Nevertheless CEXEC argues in Section II of its argument that by not raising the discrimination issues that are not appealed that they are waived.[1] Appellee's Br. at 11. Ullrich does not understand why CEXEC makes this claim and proffers this argument, as these claims are not germane to the issues on response. Hence Ullrich offers no counter.

II. **Ullrich accurately set forth evidence of Rhodes's animus.**

CEXEC contends in its brief that Ullrich misrepresented evidence of Rhodes's animus, particularly as it relates to the testimony about his conversations with Carolyn Cahoon. Br. of Appellee at12-20. However, the record reveals that Ullrich accurately set forth in his brief what the evidence shows.

In his brief Ullrich states, in part: "Rhodes had at least four or five conversations with Cahoon in which Rhodes told Cahoon that he wanted to terminate Ullrich's employment. According to Cahoon, Rhodes had conversations with her to the effect that he understood that CEXEC would be required to spend a great deal of money and time on a legal defense of Ullrich's EEOC complaint and

---

[1] The issue of waiver by failure to raise arguments in an appellate brief is typically an argument made by an appellee when an appellant raises an argument for the first time in a reply brief. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009).

1

that he considered it a "distraction" to CEXEC's business. " Br. of Appellant at 6-7 (internal J.A. citations omitted).

This characterization of the testimony is supported by the evidence in the record as follows:

```
54:2    Q  Have you ever seen Exhibit 10 before?
54:3    A  Yes.
54:4    Q  And is Exhibit 10 a copy of an EEO charge of
54:5       discrimination CEXEC received at some point
54:6       following February 24th, 2015?
54:7    A  Yes.
54:8    Q  And do you recall roughly when you might
54:9       have received it?
54:10   A  Roughly within two weeks of that date would
54:11      be my guess.
54:12   Q  And did you ever discuss this complaint --
54:13      and let me preface this.  I'm aware that counsel is
54:14      retained at some point, so I don't want any
54:15      communications with Mr., or with counsel disclosed,
54:16      but did you ever disclose or discuss the charge of
54:17      discrimination set forth in Exhibit 10 with Mr. Wes
54:18      Rhodes?
54:19   A  I did.
54:20   Q  And what, if anything, did you say to him?
54:21      I don't want to hear anything counsel may have said
54:22      to you, but what, if anything, did you tell
55:1       Mr. Rhodes about this charge of discrimination?
55:2    A  What did I tell him?  I suppose I would have
55:3       said that I thought it had no merit.
55:4    Q  Do you know if Mr. Rhodes agreed with you at
55:5       that point?
55:6    A  Yes, he did.
```

J. A. at 454-55.

```
56:12   Q  Did you ever speak with Mr. Rhodes during
56:13      May of 2015 about whether Mr. Ullrich's employment
```

2

```
56:14    might be terminated?
56:15    A  In the month of May -- I can't say
56:16    specifically.
56:17    Q  Did you ever talk with Mr. Wes Rhodes about
56:18    terminating Mr. Ullrich's employment?
56:19    A  Yeah.  I think it was a possibility at
56:20    different --
56:21    Q  When was that?
56:22    A  I'm not sure exactly when.
57:1     Q  When you say you thought it was a
57:2     possibility, what was it that you discussed with
57:3     Mr. Rhodes such that you believed it was a
57:4     possibility that you spoke with Mr. Rhodes about
57:5     potentially terminating Mr. Ullrich?
57:6     A  Well, performance concerns, and then
57:7     specifically, you know, the change in his role, you
57:8     know, just concern that if the goals could not be
57:9     met that termination would be the result.
57:10    Q  Okay.  So after Mr. Ullrich was in his new
57:11    job and his new role, Mr. Rhodes spoke to you about
57:12    potentially terminating Mr. Ullrich if he didn't
57:13    meet his new goals?
57:14    A  Yes.
57:15    Q  Okay.  How soon after Mr. Ullrich was in his
57:16    new job did Mr. Rhodes talk to you about potentially
57:17    terminating Mr. Ullrich?
57:18    A  This may sound strange, but to me it was
57:19    just always a given because the objectives were
57:20    clear.  So I can't pinpoint a specific moment in
57:21    time.  It was just always out there.
```

J.A. at 645-46; 456.

```
58:16    Q  And during that year how many conversations
58:17    do you think you might have had with Mr. Ullrich, I
58:18    mean with Mr. Rhodes about potentially terminating
58:19    Mr. Ullrich?
58:20    A  Maybe four or five.
58:21    Q  And do you recall when the last was?
58:22    A  Not specifically.
```

3

> 59:1  Q Was it after March 26, 2015, in the last two
> 59:2  months of your employment with CEXEC?
> 59:3  A I don't recall, because then his reporting
> 59:4  relationship changed at some point also.
> 59:5  Q Okay. And if Mr. Ullrich's reporting
> 59:6  relationship changed in January or February of 2015
> 59:7  when he started reporting to Devon Musselman, did
> 59:8  Mr. Rhodes talk to you after that reporting
> 59:9  relationship had changed about potentially
> 59:10 terminating Mr. Ullrich?
> 59:11 A I can't specifically anchor it to that
> 59:12 change or that time period.
> 59:13 **Q Did you ever discuss with Mr. Rhodes that he**
> 59:14 **needed to be careful about terminating Mr. Ullrich**
> 59:15 **because it would look like retaliation for having**
> 59:16 **made a complaint of discrimination or retaliation?**
> 59:17 **MR RAY: Objection as to form. Go ahead**
> 59:18 **and answer.**
> 59:19 **A Yes. I was concerned that any adverse**
> 59:20 **employment decision would reflect poorly.**
> 59:21 **Q And when did you tell Mr. Rhodes that?**
> 59:22 **A Probably multiple times throughout this**
> 60:1  **year, you know, time period.**
> 60:2  **Q And what did Mr. Rhodes say in response?**
> 60:3  **A I felt like he understood my point and, you**
> 60:4  **know, would, would try to make the best decision he**
> 60:5  **could to avoid, you know, legal concerns**.

J.A. at 457-59 (emphasis added).

> 60:16 Q Did you understand that Mr. Rhodes wanted to
> 60:17 terminate Mr. Ullrich at this point?
> 60:18 A There were performance issues, and he --
> 60:19 yeah.
> 60:20 Q Did Mr. Rhodes tell you specifically that he
> 60:21 wanted to terminate Mr. Ullrich before you resigned
> 60:22 from your employment with CEXEC?
> 61:1  A You know, I'll answer it in a little bit of
> 61:2  a different way just to say **if he could make, you**
> 61:3  **know, this distraction from his business go away**,

4

> 61:4   **life would be easier.**
> 61:5   Q  Is that what he told you?
> 61:6   A  You know, I would say it was just a general
> 61:7   feeling rather than specific words.
> 61:8   Q  What was it that Mr. Rhodes said or did such
> 61:9   that you had the feeling that Mr. Rhodes believed
> 61:10  that if he could make the distraction of Mr. Ullrich
> 61:11  go away, it would make his life easier?
> 61:12  A  **I think the recognition that it would take**
> 61:13  **time and money and legal effort to resolve which was**
> 61:14  **a distraction from the business**.
> 61:15  Q  Did Mr. Rhodes tell you that?
> 61:16  A  Probably not in so many words, no.

J.A. at 459-60 (emphasis added).

CEXEC also argues that Cahoon qualifies her testimony with words like "general feeling." Appellee's Br. at 15. CEXEC also avers that these conversations "cannot be tethered to any time period after January 2015," *id*. at 16, which was before the filing of an EEOC charge of discrimination. However, it is critical to note that Cahoon's discussions all turned on the predicate fact of CEXEC's having received a copy of Ullrich's EEOC charge of discrimination. Hence Cahoon's warnings to Rhodes that he need to be careful to avoid the appearance of retaliating for Ullrich's having filed an EEOC charge of discrimination and discussions about how the Rhodes's distraction was based on "time and money and legal effort" can only have occurred following March 24, 2015, which is when Ullrich's EEOC charge of discrimination was filed. J.A. 579.

5

As noted in Ullrich's brief, in *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court held that the Fifth Circuit erred when "while acknowledging 'the potentially damning nature' of Chesnut's age-related comments, the court discounted them on the ground that 'they were not made in the direct context of Reeves's termination.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 152 (2000). The *Reeves* Court accordingly held: "In concluding that these circumstances so overwhelmed the evidence favoring petitioner that no rational trier of fact could have found that petitioner was fired because of his age, the Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's." *Id*. at 153.

Rhodes's *expressions of intent* to retaliate are highly relevant to his *intent to retaliate* -- regardless of when they are made. If an accused person in a criminal matter articulated on multiple occasions his desire to commit a crime that he was accused of committing five months later, these statements would be viewed as highly probative of the defendant's intent to commit the crime. As retaliation, like a criminal charge, requires proof of intent, Rhodes's statement of a desire to terminate Ullrich's employment is highly relevant to whether Ullrich presented substantial evidence of causation. Rhodes's statement were articulated in the context of a discussion that he need to be careful to avoid the appearance of retaliating for Ullrich's having filing an EEOC charge of discrimination and

6

discussions about how the Rhodes's distraction was based on "time and money and legal effort," and they are no less probative because Ullrich cannot demonstrate that they were made no less than five months before Rhodes terminated him. And at the summary judgment stage, with the evidence viewed in the light most favorable to Ullrich, the Court should find a sufficient dispute of fact to warrant reversal of the district court's decision.

### III.    Ullrich establishes a *prima facie* case of retaliation.

CEXEC incorrectly contends that Ullrich cannot establish a *prima facie* case of retaliation. For a *prima facie* case of retaliation, under both the ADEA and ADA, a plaintiff must show that: 1) he engaged in protected activity; 2) his employer took an adverse action against him; and 3) that there is a causal link between the protected activity and the adverse action taken against him. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001). The case then proceeds under the familiar *McDonnell Douglas* burden-shifting framework. *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015).

CEXEC argues that evidence of Rhodes's animus toward Ullrich cannot be gleaned from the testimony of Carolyn Cahoon. But as detailed *supra* in Section II, Cahoon's testimony expressly reveals evidence of Rhodes's animus, as well as Rhodes's retaliatory desire to terminate Ullrich's employment, which Rhodes singlehandedly carried out in September 2015.

7

CEXEC relies on this faulty argument in its assertion that Ullrich cannot establish temporal proximity plus an intervening period of retaliatory intent. While it is true that when a plaintiff relies on temporal proximity alone, that temporal proximity must be very close in time. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). But when there is intervening evidence of retaliatory intent the temporal proximity can be greater. *Id.* Contrary to CEXEC's assertions in this matter, the evidence demonstrates that Rhodes expressed an unambiguous retaliatory intent to terminate Ullrich multiple times and then served as the sole decisionmaker in terminating Ullrich's employment. J.A. at 556. Even if Rhodes made no such remarks after May 2015, a reasonable jury could infer that Rhodes nonetheless carried out a previously stated intent to terminate Ullrich as soon he had an opportunity to do so under the guise of a reduction-in-force. This evidence, drawn in a light most favorable to Ullrich, warrants a reversal of summary judgment.

### IV.    CEXEC's asserted legitimate business reason is pretext.

Once an employer puts forth a legitimate, non-retaliatory reason for an adverse action, the employee has the burden to prove that the stated legitimate reasons offered by the employer are pretext. *Reeves*, 530 U.S. at 143. An employee may meet this burden by showing that the defendant's stated reasons for

termination were not the real reasons for the termination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508 (1993).

First, CEXEC contends that Ullrich cannot establish pretext because Ullrich's characterization of Cahoon's testimony regarding Rhodes's statements of intent is inaccurate. For the reasons argued above, Rhodes's retaliatory intent can be gleaned from this evidence.

Second, CEXEC argues that Ullrich failed to set forth evidence that his Direct Work Plan met the requirements put forth by CEXEC. But as Ullrich noted in his opening brief, the directive from Devon Musselman to Ullrich on September 8, 2015 was to "either find direct coverage for yourself immediately, or [] immediately identify a viable business opportunity for you to actively pursue that we think has a probability of win for CEXEC." J.A. at 581. And the evidence shows that Ullrich identified such a plan in his Direct Work Plan, on which the RFP was set to release on September 21, 2015, which was the day that CEXEC terminated Ullrich. J.A. at 328. CEXEC dismisses this identified opportunity on the grounds that the government released the RFP later and that CEXEC could not ultimately bid on it. Br. of Appellee at 27-28. But CEXEC has not produced evidence that CEXEC knew of these details at the time it terminated Ullrich's employment on September 21, 2015. And Musselman's directive was for Ullrich's to "immediately identify a viable business opportunity for [him] to actively

9

pursue." J.A. at 581. It did not mandate that Ullrich identify an "opportunity on which CEXEC could immediately bid." Br. of Appellee at 28, n. 11. Thus, a reasonable jury could conclude from this evidence that this stated reason for termination was not the true reason for CEXEC's decision to terminate Ullrich.

Third, CEXEC argues that Long and Hottot are insufficient comparators. The case that CEXEC relies on for this point, *Haywood v. Locke*, notes that comparators "need not be an exactly match…" 387 F. App'x 355, 360 (4th Cir. 2010) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). In identifying valid comparators, "the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation—recall that the plaintiff need not *prove* anything at this stage." *Humphries*, 474 F.3d at 405. Here, there is evidence that these individuals were subject to layoff in 2015, J.A. at 632, and yet the evidence reveals that these individuals were not terminated like Ullrich even though they did not become fully directly billable until November 2015. J.A. at 545-47. In other words, a jury could infer from this evidence that CEXEC's stated reason for termination is pretextual.

Finally, CEXEC states that the documents in the record revealing that Rhodes decided to terminate Ullrich on September 9, 2015, J.A. at 556, do not

10

show pretext because Rhodes's email contemplates that "[s]hould any impacted employees obtain direct work that covers their cost prior to their separation then we will revisit their involuntary separation." But the record also reveals the CEXEC processed the paperwork to terminate Ullrich, including approving severance pay on September 16, 2015, which Rhodes himself signed. *Id*. at 558-59. Thus, a reasonable jury could conclude from this evidence that CEXEC's stated reason for the termination was not the true reason and was pretextual. For these reasons, the district court's grant of summary judgment should be reversed.

## **CONCLUSION**

CEXEC's opposition does not effectively argue that the district court's grant of summary judgment as to Ullrich's retaliation claims should be affirmed. Ullrich accurately presented evidence of Rhodes's animus. Ullrich also raised a sufficient factual question of causation to warrant reversal of summary judgment. And Ullrich presented sufficient evidence to show that CEXEC's stated reason for his termination was pretextual.

For these reasons and those stated at length in his Ullrich's opening brief, this Court should reverse the district court's grant of summary judgment in favor of CEXEC on Ullrich's ADEA and ADA retaliation claims and remand to the district court for a trial by jury.

11

Respectfully submitted,

/s/ Nicholas Woodfield
Nicholas Woodfield
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, NW, 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com

*Counsel for the Appellant*

12

# **CERTIFICATE OF COMPLIANCE**

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*2,807*] words.

   [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief document complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: July 24, 2017                            /s/ Nicholas Woodfield
                                                        *Counsel for Appellant*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of July 2017, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Amanda S. DiSanto
> Steven W. Ray
> ISLER DARE, PC
> 1945 Gallows Road, Suite 650
> Vienna, Virginia  22182
> (703) 663-1317
>
> *Counsel for Appellee*

I further certify that on this 24th day of July 2017, I caused the required copy of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Nicholas Woodfield
*Counsel for Appellant*
